UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ENZA SIVIO,<br><br>　　　　　　Plaintiff,<br><br>　　　vs.<br><br>VILLAGE CARE MAX,<br><br>　　　　　　Defendant. | Case No.: 18-cv-2409<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS PURSUANT TO FRCP 56.1** |

　　　　Plaintiff Enza H. Sivio ("Sivio"), by her attorneys The Clancy Law Firm, P.C., submits this counterstatement of disputed material facts in support of Defendant Village Care Max's ("VCMAX") motion for summary judgment to dismiss Plaintiff's Amended Complaint.

**Plaintiff's Statement of Additional Material Facts**

　　　　1.　　Prior to her employment with VCMAX, Plaintiff worked as a telephonic nurse Case Manager for Integra MLTC, an insurance company. (Clancy Declaration "Decl.", Exhibit E, Plaintiff's 2017 Resume). Her position did not require field work. Plaintiff left her previous position in order to accept an employment offer for a Care Manager position from VCMAX, with the understanding that the new position was nearly identical to her previous position as a Case Manager. Her previous position did not require field work. (Sivio Deposition "Dep.", p. 38:5-15; pp. 53:24-54:9).

　　　　2.　　Plaintiff, a registered nurse, was considered qualified for her position with VCMAX. (Michelle Clickner Deposition "Clickner Dep."., p. 105:8).

　　　　3.　　Plaintiff suffers from asthma which hampers her breathing and affects her daily life. Asthma is a recognized disability under the ADA. Her asthma is exacerbated and can become potentially life threatening when she is exposed to her allergens, which include dogs and cats. (Clancy Decl., Exhibits F and G, Doctors' Medical Notes; Sivio Dep., pp. 297:2-14)

　　　　4.　　After Plaintiff learned that her position required field work that exposed her to her triggers, namely pets, <u>Plaintiff requested at least five reasonable accommodations</u> from her employer, all of which would allow her to continue to perform the essential duties of her job. She supported these requests with medical documentation. (Clancy Decl., Exhibits F and G, Doctors' Medical Notes).  <u>VCMAX denied Plaintiff's every request without plausible explanation or any demonstration of undue burden</u>. <u>VCMAX never offered Plaintiff an alternative accommodation</u>. Her requests, and VCMAX's purported reasoning for rejecting those requests, included, *inter alia*, the following:

i.)         Plaintiff requested that VCMAX screen its members who required home visits, and especially extensive in-home assessments, to find out if they had pets in their home. She requested that any members with pets not be assigned to her case load, or in the event they were assigned to her, that she be permitted to find a substitute to conduct the home visits and/or assessments, or to swap the assigned member for a member who did not have pets with a fellow Care Manager.

        Screening members' home environments for factors that could affect their health and safety is an integral part of VCMAX business model, which includes UAS ("Uniform Assessment System") assessments and reassessments for members needing in-home care. Screening for pets in members' environments is often already included in UAS assessments for members with, for example, a heightened risk of falling, since having a pet could exacerbate that risk. (Sivio Dep., p. 139:22-141:2). VCMAX could have easily screened for pets in its member's environments through the in-home assessments that it already conducted. Doing so would require virtually no additional time, effort, or cost to VCMAX, and in fact, could arguably increase the effectiveness with which they evaluated the health and safety of their members' home environments.

        After screening for pets, VCMAX could have swapped members with pets assigned to Plaintiff for members without pets. Other Care Managers were permitted to swap assignments. (Sivio Dep. pp. 149:7-152:17). Other Care Managers expressed their willingness to swap assignments with Plaintiff to accommodate her allergies. (Sivio Dep. p. 327:25-328:7) Despite these factors, Defendant refused to grant Plaintiff's reasonable request, simply by stating that they didn't currently screen for pets and doing so would require a "change in their business model" and "effect their bottom line" (Defendant's Statement of Undisputed Facts, ¶¶ 40-41). Until now, <u>Defendant cannot explain why or how Plaintiff's request would require a change in their business model or any other financial, or otherwise undue burden.</u>

ii.)        Plaintiff alternatively requested that if, upon entering a member's home, she discovered that that member had pets, she be permitted to find a substitute to conduct the home visit or assessment, such as another Care Manager, a Field Nurse, or a third-party contractor (which VCMAX employed to conduct field work) (Sivio Dep., p. 168:5-13). Donna Langaigne, Plaintiff's supervisor, rejected this request without justification, even after previously having granted it. (Sivio Dep., pp. 25:23-26:7 143:11-146:20; 166:8-168:22; 184:1-186:10). In fact, after telling Plaintiff she could call her to devise a workaround in the event she entered a member's home with pets, Langaigne forced Plaintiff to conduct home visits and assessments for members who had pets, even when Plaintiff called Langaigne and informed her that she was having an asthma attack. Plaintiff still conducted these visits, despite their detrimental, and potentially life threatening effect on her health. (Sivio Dep., *Id.*). VCMAX had a practice that did not require Care Managers to enter member's homes if they felt they were in danger. (White Dep., 89:9-25; 90:2-5; Clickner Dep., pp. 84:22-86:9)

iii.)     Plaintiff offered that VCMAX increase her caseload and/or require her to work from their Manhattan office rather than in her home, as she was hired to do, on the condition that she not be required to conduct home visits for members with pets. Defendant never addressed this request. (Sivio Dep p. 261:16-24)

iv.)     Plaintiff offered that her caseload be kept above 85 members and she only be required to conduct "welcome visits," which were much shorter than assessments or reassessments visits. The shorter visits would shorten the time she would be exposed to her triggers and lessen the exacerbation of her asthma. Despite the fact that VCMAX admittedly had a model where Care Managers with a case load of above 85 members were not required to conduct extensive field work such as UAS assessments and reassessments, VCMAX refused Plaintiff this accommodation, without any logical explanation. (White Dep., p. 277:19-23; Clickner Dep., pp. 129:12-130:7; *see also,* Witkin Decl., Ex. E, at 127-131)

v.)     Plaintiff requested she be given a different position at within the company for which she was qualified, that did not require home visits or field work. VCMAX failed to offer or even investigate whether such a position was available, despite the fact that such positions existed. VCMAX HR Vice President Amparo-Peterkin White "Pam White" told Plaintiff that no such positions existed, but later admitted that she did not look for one in her deposition. (White Dep., pp. 55:21-25; 56:24; 84:11-25; 145:6-8; Clickner Dep., 202:11-15; *see also,* Witkin Decl., Ex. E, HR Meeting Recording Transcript at 917).

5.     VCMAX did not find issues with Plaintiff's performance prior to their receiving written notice of Plaintiff's request for accommodations for her disability, during the first ninety days of her employment, which was considered a probationary period. (Clancy Decl., Ex. H, Email Oct. 12, 2017 email from Michelle Clickner) During this period, Plaintiff had already disclosed her medical condition and regularly took measures to avoid conducting home visits for members with pets. (Sivio Dep., pp. 136:10-138:24; White Dep. 235:13, Clickner Dep., p. 187:16-25; 241:16-24; Lagaigne Dep., p 233:19-23).

6.     Despite their detrimental effect on her health, from the start of her employment until her termination on November 9, 2017, Plaintiff <u>never</u> refused to conduct a home visit. (White Dep., 146:3-6).

7.     Within one week of Plaintiff's supervisors and HR purportedly "investigating" Plaintiff's requests for accommodations, VCMAX supervisors including Peggy Mavrinac, Michelle Clickner, and Richard Bottone, discussed and/or recommended that she resign. In the following months, and shortly after Plaintiff's multiple complaints to Human Resources that her supervisors Clickner and Lagaigne were harassing her, Clickner expressed an explicit wish to terminate Plaintiff. (Clancy Decl., Ex. I, Emails Recommending Plaintiff's Resignation and/or Termination). VCMAX Human Resources Vice President Pam White admitted that this chain of events was "troubling." (White Dep., 186:2-24).

8. Throughout her employment and following her termination, Plaintiff was aware of Care Managers employed by VCMAX who were not required to conduct field work, or who were given the option to do so on a per-diem basis. (Sivio Dep. pp. 110:9 -112;12; pp. 276:8-280:20). Indeed, Clickner admitted that after Plaintiff was terminated, caseloads increased to the point that VCMAX limited the home visits and field work required of its Care Managers. (Clickner Dep., p. 345; 3-14).

9. Plaintiff was terminated on November 9, 2017, within one month of filing a charge for disability discrimination with the EEOC on October 18, 2017. (Clancy Decl. Ex. J, Plaintiff's EEOC Charge; Ex., K, Plaintiff's Termination Letter.)

10. VCMAX never instructed Human Resources Vice President Amparo-Peterkin White, Care Manager Supervisor Michelle Clickner, or Care Manager Supervisor Donna Lagnaigne to search for or preserve any documents, many of which Plaintiff, pro se, requested during discovery to substantiate her claims. (White Dep., p. 9:3; Clickner Dep. p. 15:18-23; Langaigne Dep. p. 10:10-15).

### Plaintiff's Response to Defendant's Statement of Material Facts

### Background

1. Plaintiff admits the statement.

2. Plaintiff admits the statement.

3. Plaintiff admits the statement.

4. Plaintiff disputes the statement. Prior to the commencement of Plaintiff's employment with Village Care Max ("VCMAX"), Plaintiff was called by VCMAX recruiter Frank Espinales ("Espinales") on two occasions. On the first occasion, Espinales offered Plaintiff the opportunity to interview for a UAS ("Uniform Assessment System") Field Nurse position, which required home visits to VCMAX member patients, referred to as "members." During that call, Plaintiff immediately informed Espinales that due to her medical condition of chronic asthma, she could not work as a field nurse or conduct UAS assessments in members' homes. She informed him that conducting home visits risked exposing her to her allergens and triggering her asthma.

Approximately two weeks to one month later, Espinales called Plaintiff again, and this time stated, "I have the perfect position for you." Espinales informed Plaintiff of an open position for a "telephonic nurse care manager" which would not require home visits, conducting UAS assessments, or other field work. This was the position Plaintiff interviewed for and accepted under the title of "Care Manager." (Sivio Deposition "Dep" pp. 41:17-47:14; 57:11-58:3; Clickner Dep., 103:14-24).

5. Plaintiff disputes the statement. The Care Manager duties, as described in the application that Defendant submits, "e-signed" by Plaintiff, on March 9 2017, state, "assessments will be conducted telephonically or in home." (Leacock Declaration, Exhibit 1).

(Emphasis added). Nowhere in the description of Care Manger duties is there any reference to "field work." In fact, each element of the description refers to tasks that could be accomplished telephonically, without in-home visits.

As VCMAX Human Resources admits, the job description Plaintiff responded to in applying for the Care Manager position <u>did not list all the duties of the position</u> and has significant differences to the description Plaintiff was given <u>after</u> accepting the position. (Amparo-Peterkin White "Pam White" Deposition "White Dep." p. 131:16).

Plaintiff accepted the Care Manager position with the understanding, after Espinales verbally assured of the same, that she would be able to conduct all the duties of the Care Manager telephonically. At no point, prior to or at the time of her hiring by VCMAX, either in her initial interviews with Frank Espinales or Michelle Clickner, Assistant Director for Care Managers, was Plaintiff informed that she would be required to do "field work consisting of home visits" as an essential part of her job. Furthermore, <u>VCMAX employed Care Managers who were not required to conduct home visits at the time that Sivio was employed</u>. One such Care Manager was named Ketticia Lewis. (Sivio Deposition "Dep" pp. 41:17-47:14; 52:12; 176:11).

6. Plaintiff disputes the statement. See ¶5.

7. Plaintiff disputes the statement. See ¶5.

8. Plaintiff admits the statement.

9. Plaintiff admits the statement.

10. Plaintiff admits the statement.

11. Plaintiff admits the statement.

12. Plaintiff admits the statement.

13. Plaintiff disputes the statement. VCMAX has failed to provide evidence that the practice of conducting random audits was uniformly applied in reviewing the performance of all Care Managers. Defendant has only provided emails purportedly describing the negative results of a random audit and full audit they conducted on Plaintiff's performance, <u>shortly after Plaintiff requested reasonable accommodations in writing</u>. (Langaigne Decl., Exhibit 1). Defendant has provided no evidence, documentary or otherwise, as to how those results compare to the results of audits conducted on the performance of other Care Managers at VCMAX, despite Plaintiff's requests.

14. Plaintiff disputes the statement. See ¶13.

15. Plaintiff disputes the statement. See ¶13.

16. Plaintiff disputes the statement. See ¶13.

17. Plaintiff suffers from severe pet allergies and chronic allergic asthma, meaning her asthma is exacerbated by exposure to her allergens. On allergen skin testing, Plaintiff is highly allergic to dust mites, cat, dog, grass pollen, ragweed pollen, tree pollen, cockroaches and mold. (Plaintiff's Complaint, ¶3; *see also* Clancy Declaration, Exhibit E, Dr. Parikh Medical Note).

18. Plaintiff has a disability recognized by the Americans with Disabilities Act ("ADA") which hampers her ability to breathe upon exposure to her triggers. (Plaintiff's Complaint ¶4). Plaintiff's medical history includes a cardiac arrest and hypoxic brain injury caused by the exacerbation of her asthma, which she suffered at the age of 14. Given her history, her risk of potentially life-threatening exacerbation upon exposure to her triggers is very high. (Clancy Decl., Exhibit E, Dr. Parikh Medical Note).

19. Plaintiff suffers from rashes and difficulty breathing upon exposure to pets. (Complaint ¶4; Sivio Dep. Pp. 47:6-52:3).

20. Plaintiff is allergic to Ragweed. (Sivio Dep. Pp 69:15-69:24; 70:2); (*See also,* Clancy Decl., Exhibit G, Dr. Parikh Medical Note*).*

21. Prior to her employment with VCMAX, Plaintiff carried an albuterol inhaler with her at all times. (Sivio Dep. 67:19-68:18). After extensive exposure to her triggers through conducting home visits for VCMAX members with pets, Plaintiff began a medical treatment plan, as suggested by her employer, through Human Resources representative Amparo-Peterkin White ("Pam White"), of multiple medications and allergen immunotherapy in an attempt to allow her to continue to conduct home visits and cope with the exacerbation of her asthma. (Sivio Dep. 244:10-247:8) (*See also*, Defendant's Statement of Undisputed Material Facts, ¶60).

These medications included Advair 500/50 BID, Ventolin, Singulair, and upwards of 80-100 mg of prednisone a day, and weekly visits to her doctor for immunotherapy. These medications, especially systemic steroids, had severe side effects and detrimental impacts on her health. (Cite Sivio Dep; *see also*, Clancy Decl., Exhibit G, Dr. Parikh Medical Note)

22. Plaintiff disputes the statement. Plaintiff submitted the online application after being interviewed and verbally accepting the position. Michelle Clickner sent an email to Frank Espirales on March 8, 2017, indicating that Plaintiff had been interviewed prior to the purported submission of the online application. (Clancy Decl., Exhibit L, VC000153-154)

In March of 2017, Plaintiff was not aware of the open position at VCMAX until Frank Espirales informed her of it and offered her the opportunity to interview for the position as a "telephonic nurse Care Manager" who would not be required to conduct home visits. It was for the position verbally described as "telephonic nurse Care Manager" that Plaintiff understood she was accepting VCMAX's offer of employment. (Amended Compl. ¶6) (Sivio Dep. p 90:5).

After being told she had been selected for the position, Plaintiff was instructed to complete online forms by Espirales. Plaintiff was given a log-in code and website, and after logging in, clicking through a series of forms wherein all of the information was already filled out, as instructed over the phone by Espirales. Plaintiff was not directed to read the application to determine if it comports with her understanding of the job duties. Plaintiff and was not informed

<u>that it altered her duties so that she would be required to conduct home visits as part of her employment with VCMAX</u>. (Sivio Dep. pp. 90:5-93:19).

23. Plaintiff admits the statement. Plaintiff notes that the offer of employment was sent by Frank Espirales "Recruiter." Plaintiff also notes that the letter says nothing about Care Managers conducting "field work." Plaintiff further notes that the offer letter Defendant submits is unsigned by Plaintiff. (Leacock Decl., Ex. 2).

24. Plaintiff admits the statement.

25. Plaintiff disputes the statement. In fact, when Plaintiff saw that the job description provided to her on April 10, 2019 did not accurately reflect her job description, she immediately addressed the issue with human resources and refused to sign her full name to the document. (Sivio Dep. pp. 99:6-100:19).

The document Defendant provides indicates Plaintiff was provided the job description for Care Manager on the first day of her employment orientation, on April 10, 2017, after she had already been offered and accepted employment. What is more, the signature on the document Defendant provides is <u>not her full signature</u>. (Leacock Decl. Exhibit 2). For a comparison to Plaintiff's full signature, see the following VCMAX documents signed by Plaintiff. (Clancy Decl., Ex. M.)

Plaintiff received this or a similar document on the first day of her orientation and noted the sections that state "some portions (less than 50%) of daily assignments require travel to Client/resident/patient locations or other work sites, via car or public transportation" and that Care Managers would "provide ongoing care management of members though home visits <u>and</u> telephonic contact." (Emphasis added). Plaintiff notes that this language was <u>not included in the online application documents</u> she submitted prior to the commencement of her employment. In contrast, the documents she signed prior to the commencement of her employment stated, "assessments will be conducted telephonically <u>or</u> in home." (*See* Plaintiff's Counterstatement of Disputed Facts, ¶22).

Plaintiff stopped in the middle of signing her name to this document or a document similar to it on or about April 10, 2017, and immediately addressed the issue with human resources representatives. She brought the documents to a female HR representative and said, "this is not something I can do," referring to conducting visits to patient locations and traveling. The HR representative she spoke to then took the documents from Plaintiff and said, "it's not an issue, we will take the document as-is and we'll take your offer letter." Plaintiff also suggested that they speak to Michelle Clickner about the issue, and the HR representative responded, "no it's okay. If that's what they said [referring to the verbal agreement that she would not have to go into the field], it's fine." (Sivio Dep pp. 100:1-108:8).

26. Plaintiff disputes the statement. See ¶25.

27. Plaintiff disputes the statement. See ¶25.

28. Plaintiff disputes the statement. See ¶25.

## Sivio's Employment with VCMAX

29. Plaintiff disputes the statement. Plaintiff was not being trained to conduct a UAS assessment as conducting such assessments was primarily the job of Field nurses/UAS assessors. (Clickner Dep., p. 120:7). As part of her orientation, on April 19, 2017, Plaintiff was assigned to shadow a field nurse/UAS assessor, named Sharon Simon. (Clancy Aff. Exhibit N, Emails Assigning Sivio Shadow Visits on 4/20/2017, VC000127-138).

Plaintiff understood she was shadowing a UAS assessment to "see how it was done," in order to inform her role as a case manager, who would read and evaluate the results of such an assessment. Plaintiff did not believe, and was not informed, that the shadow visit was for the purpose of conducting such an assessment herself. This was a job assigned to UAS assessors/field nurses at VCMAX.

In fact, on July 19, 2017 Plaintiff asked her supervisor, Donna Langaigne, if UAS assessments were required of Care Managers, and was informed that such assessments were optional and compensated on a per diem basis. (Clancy Decl., Ex. O). (VC000164-168)

During orientation, as soon as Plaintiff was informed that she would be entering a member's home, she alerted the nurse evaluator assigned to her, Milena Zaprianova, and another clinical trainer, Eugene Litmanovich, that she could not go into homes because of her asthma and allergy to pets. Ms. Zaprianova told Plaintiff to speak to the field nurse to whom she was assigned, Sharon Simon, and ask her to ensure they went to a member's home who did not have pets. Plaintiff did so. Ms. Simon assured that together they visited a member without pets and the shadow visit was conducted without issue for Plaintiff.

The same applies to the home visit assessment Plaintiff conducted "satisfactorily" as part of her orientation on May 9, 2017. Plaintiff again informed Ms. Zaprianova, prior to the assessment, that she could not assess a member in their home if they had pets. Ms. Zaprianova instructed Plaintiff to call a list of members ahead of time to find out if they had pets. Plaintiff did so and successfully arranged to assess a member who did not have pets. (Sivio Dep pp. 117:12 – 124:45; 125:24-130:3).

30. Defendant fails to define "regularly." Defendant has failed to provide information as to the number of home visits that were assigned to Plaintiff throughout her employment. Plaintiff recalls that assignments were made through a spreadsheet. Defendant has failed to provide this spreadsheet despite Plaintiff's request. (Sivio Dep. pp 133:6-136:9).

Plaintiff maintains that assignments for home visits and UAS reassessments were not a regular occurrence and were marginal compared to her telephonic duties. Michelle Clickner has admitted that the majority of Care Managers' work was performed telephonically (Clickner Dep., pp. 54:23-55:13).

Furthermore, Plaintiff was instructed by her supervisor Donna Langaigne to call ahead prior to visits to find out if the member she was assigned to visit had pets, and if so, Langaigne stated that she would work to assign the visit to another Care Manager, to a Field Nurse/UAS assessor, or to find a third party vendor to conduct the visit. (Sivio Dep. pp. 25:23-26:7; 136-10; 143:3-146:20; 166:8-168:22; 184:1-186:10; Clickner Dep., p. 187:16-25; 241:16-24).

31.     Plaintiff disputes the statement. Plaintiff cannot confirm that she visited a member's home with pets "each month." Defendant has not provided evidence to support this statement. The citations Defendant make to Plaintiff's deposition and Amended Complaint to support this statement do not state that Plaintiff went on home visits with pets "each month."

32.     Plaintiff admits the statement.

33.     Plaintiff admits the statement.

34.     Plaintiff disputes the statement. Plaintiff informed VCMAX upon application for employment of her chronic asthma. (*See* Defendant's Statement of Disputed Material Facts, ¶¶ 4-7). Plaintiff informed HR representatives during orientation that she could not do field work due to her disability and refused to write her complete signature on the job description provided to her at orientation for this reason. (*See* Statement of Disputed Material Facts, ¶¶ 25-28). Plaintiff also her disclosed her disability of Chronic Asthma to VCMAX Occupational Health prior to the commencement of her employment. (Sivio Dep. pp. 87:22-88:24). Defendant has failed to provide its records of Plaintiff's occupational health assessment despite the fact that Plaintiff's requests. Plaintiff was medically cleared for her employment on March 20, 2017. Clancy Decl. Ex. P, Email Clearing Plaintiff Medically.).

<u>Pam White, Vice President of VCMAX human resources, failed to conduct a proper investigation into whether a reasonable accommodation for Plaintiff's disability was possible</u>. White misunderstood ADA and believed VCMAX did not have a duty to offer a reasonable accommodation. White admits that she believed the burden was entirely on Plaintiff to propose a reasonable accommodation even after all her requests were unjustifiably rejected. (White Dep., p. 21:16-24). White failed to investigate if Plaintiff's job duties could be restructured, despite the fact that VCMAX had restructured the job duties of a disabled employee. (White Dep., 229:6-230:10). White never investigated if there was another position at VCMAX for which Plaintiff was qualified, despite the fact that such positions existed and VCMAX has numerous departments. (White Dep. 55:21- 56:24; 84:11-25). Plaintiff expressed interest in an alternative position as a reasonable accommodation, even if such position paid a lesser salary (Sivio Dep p. 261:16-24).

35.     Plaintiff admits the statement.

36.     Plaintiff disputes the statement. VCMAX admitted that not conducting field work/home visits was a reasonable accommodation for her disability of chronic asthma when Espinales, who knew of her disability, informed Plaintiff that the position for which she was interviewing was a telephonic position that would not require field work/home visits. (Plaintiff's Counterstatement of Disputed Material Facts, ¶ 4). VCMAX, by its employee

Michelle Clickner, admitted in a meeting with Plaintiff present that VCMAX tried not to send Care Managers into the field when they had a caseload of over 85 members. (White Dep., p. 277:19-23; Clickner Dep., pp. 129:12-130:7; *see also,* Witkin Decl., Ex. E, HR meeting recording transcript at 127-131). Plaintiff had a caseload of up to 91 members. (Amended Complaint ¶6). VCMAX employed Care Managers who did not work in the field. Home visits were a marginal, not essential duty of a Care Manager's employment. (Sivio Dep. pp. 110:9 - 112;12; pp. 276:8-280:20.) Plaintiff's duties required her to spend the majority of her time, at least five to six hours per day, making telephone calls to members, completing requests for services and care planning. (Clickner Dep., pp. 54:23-55:13).

37.     Plaintiff disputes the statement. Pam White testified positions existed for which Plaintiff was qualified that did not require home visits. (White Dep., pp. 55:21-25; 56:24; 84:11-25). Pam White and Michelle Clickner failed to look for an alternative position for Plaintiff despite Plaintiff's requests and VCMAX's duty to engage in the "interactive process" required by the employer under the ADA. (Clickner Dep., 202:11-15).

38.     Plaintiff disputes the statement. VCMAX employed Care Managers who did not conduct home visits. . (Sivio Dep. pp. 110:9 -112;12; pp. 276:8-280:20). VCMAX had a model where Care Managers with a case load of over 85 members were not required to conduct field work or home visits as much as possible. (White Dep., p. 277:19-23; Clickner Dep., pp. 129:12-130:7; see also, Witkin Decl., Ex. E, at 127-131)

Further, in 2017, VCMAX had over 5,000 members, and 20-30 Care Managers. It would have been impossible for each member to have been assigned to 20-30 Care Managers, and for those Care Managers to conduct home visits for all 5,000 members. Based on those statistics, Care Managers would have to visit approximately 167 members a month, and 5-6 members a day to meet the required ratio of Care Managers to Members. VCMAX contracted outside vendors to perform field work. (White Dep., 61:5-64:9)

VCMAX claims of financial burden are unspecific, unsubstantiated, and purely conclusory, without evidentiary support.

39.     Plaintiff disputes this statement. VCMAX could have assigned Plaintiff's home visits to the third-party contractors it employed to conduct field work. VCMAX had the financial capability to hire additional Care Managers. VCMAX was constantly interviewing and hiring new Care Managers (Clickner Dep., p. 53:5-11; p. 89:18-22).VCMAX had displaced duties to other employees in order to accommodate an employee's disability in the past. (White Dep., 229:6-25; 230:2-10)

40.     Plaintiff disputes this statement. Defendant claims Plaintiff's minor accommodation would effect its "bottom-line" despite the fact that VCMAX is a not-for-profit company with federal funding and profits exceeding 20 million dollars. (Clancy Decl., Ex. Q, Village Care 2016 990 Form). VCMAX has not and cannot show how Plaintiff's request would affect its bottom line.

41.     Plaintiff disputes this statement. VCMAX had the financial capability to hire a new Care Manager without significant financial burden. In fact, VCMAX was constantly

interviewing and hiring new Care Managers (Clickner Dep., p. 53:5-11; p. 89:18-22). Further, in 2017, VCMAX employed Care Managers, just like Plaintiff, who did not conduct home visits. (Sivio Dep. pp. 110:9 -112;12; pp. 276:8-280:20). In 2017, after Plaintiff's termination, Care Managers, just like Plaintiff were no longer required to conduct home visits and only did so on an optional and per-diem basis. (Clickner Dep., p. 345; 3-14).

42. Plaintiff disputes this statement as speculative and unsubstantiated. Plaintiff was willing to accept a lesser salary in order to be accommodated. (Sivio Dep p. 261:16-24). Defendant provides no information as to other employees who had similar disabilities which would result in their requesting similar accommodations and thus its statement that it would have to grant similar accommodations to other Care Managers is speculative and unsubstantiated. During and after Plaintiff's employment, VCMAX employed Care Managers who were not required to conduct home visits. (Sivio Dep. pp. 110:9 -112;12; pp. 276:8-280:20; Clickner Dep., p. 345; 3-14).

43. Plaintiff disputes this statement. Plaintiff testified that she was aware of Care Managers employed by VCMAX who were not required to conduct field work or home visits. Plaintiff further became aware that field work/home visits were made optional following her termination. (Sivio Dep. pp. 110:9 -112;12; pp. 276:8-280:20; Clickner Dep., p. 345; 3-14).

**Sivio's Requested Accommodations**

44. Plaintiff disputes this statement. Defendant omits Plaintiff's numerous requests for accommodations which were denied without rational explanation, and misleadingly portrays the facts as if Plaintiff's sole request for accommodations was to not be required to conduct home visits at all. This is not the case. In fact, <u>Plaintiff offered at least 5 alternative requests for accommodations</u>. Defendants rejected each without a rational explanation, any showing of a business justification, or undue burden that would merit rejecting her requests. (*See*, Plaintiffs Statement of Additional Material Facts, ¶4).

45. Plaintiff admits the statement.

46. Plaintiff disputes this statement. Plaintiff disclosed her chronic asthma and medical history to Defendant upon completing an Occupational Health examination. (Sivio Dep., p. 88:3-19). Plaintiff was medically cleared for her employment on March 20, 2017. Clancy Decl. Ex. P, Email Clearing Plaintiff Medically.).

**The Interactive Dialogue Process**

47. Plaintiff admits the statement.

48. Plaintiff admits the statement.

49. Plaintiff disputes the statement. Upon receiving the request for documents from CareWorks, Plaintiff contacted Human Resources representative Juan Pichardo. Pichardo assured Plaintiff that she could provide all necessary documentation to Human Resources

directly. Plaintiff provided all requested documentation to Human Resources directly. (Cite Sivio Dep., pp. 203:19-204:3; Clancy Decl. Exhibit R, Pichardo Emails VC000264-267).

50.     Plaintiff admits the statement. However, Plaintiff disputes that the determination that screening members for pets was not possible. VCMAX's denial of this reasonable accommodation was made without clear reasoning or justification, other than vague statements concluding that it couldn't be done simply because it wasn't currently done. (Witkin Decl., Exhibit E, Meeting Transcript at 499-500; White Dep., 249:8-15)

51.     Plaintiff disputes the statement. Plaintiff was allowed to call members ahead to determine if they had pets during orientation and the first months of her employment. Plaintiff even kept a spreadsheet of members who had pets. (Sivio Dep., pp. 166:13-168:22).

Defendants claim that screening members for pets would require a change in VCMAX's "business model." This is assertion is purely conclusory. Defendant makes no attempt to explain how or why a relatively minor change in duties, like the one suggested would affect their overall business model.  Indeed, UAS assessments include an evaluation of the member's environment. Some UAS assessments include determining whether patients have pets and whether such pets have an impact on a patient's health/risk of injury. Screening members for pets is already included in VCMAX's business model. (*See*, Plaintiff's Statement of Additional Material Facts, ¶4(i)).

Furthermore, Care Managers, like Plaintiff, were not required to conduct initial UAS assessments. Care Managers were given the option to do so on a per-diem basis. (Sivio Dep. pp. 110:9 -112;12; pp. 276:8-280:20; Clickner Dep., p. 345; 3-14). VCMAX could have simply included a notation of whether there were pets in the home by the UAS assessor. This evaluation would take virtually no time and include, at most, observing the member's home environment, as already required, and checking a box. Then, Plaintiff could simply be relieved of the requirement of visiting members' homes with pets, and be assigned only members without pets.

Plaintiff has never suggested that VCMAX not service members with pets. Plaintiff has simply suggested that such members not be assigned to her if she is required to visit their homes.

52.     Plaintiff disputes the statement. Plaintiff called ahead to members to find out if they had pets in advance of home visits with her supervisor's approval. When Plaintiff visited homes of members who had pets, despite informing her otherwise, Plaintiff was told by her supervisor that she need only call her and they would find a "work around," such as assigning the visit to another Care Manager, a field nurse, assessor, or a third-party contractor. However, in the instances that Plaintiff entered a members' home and found out they had pets, her supervisor forced her to conduct the visits, even when Plaintiff was having an asthma attack.

53.     Plaintiff disputes the statement. VCMAX never investigated whether an alternative position that did not require home visits, for which Plaintiff was qualified, existed. Such positions did exist. Furthermore, on October 17, 2017, Plaintiff found an online job

application for a Care Manager which did not mention anything regarding field work or home visits. (Clancy Decl., Ex. S, Care Manager Job Description With No Mention of Field Visits VC000032-33).

      54.      Plaintiff admits the statement.

      55.      Plaintiff disputes the statement. In the September 26, 2017 meeting, Plaintiff stated that she quit her previous job, which did not require field work, because she was told upon hiring that not all Care Managers would be required to go into the field. (Witkin Decl. Ex. E, HR Meeting Transcript at 874-883).

      56.      Plaintiff admits the statement.

      57.      Plaintiff admits the statement. However, in the September 26, 2017 meeting, Plaintiff made clear that "the request is not to create a new structure of how VCMAX does business" (Witkin Decl., Ex. E, at 516). Her request was simply that upon discovering a member assigned to her had pets, she be allowed to find a substitute for the member, or the member be reassigned, which was commonly done amongst Care Managers to accommodate language and locations.

In the meeting, Defendant provided no rational explanation for why members could not be screened for pets. In fact, when Donna Langaigne began to explore whether or not a member had pets could be determined on a case by case basis, she was stopped and interrupted by Pam White, who ended the inquiry by stating simply, "you are not currently doing that." (*Id*., at 499-500).

      58.      Plaintiff admits the statement.

      59.      Plaintiff admits the statement but notes that VCMAX provides no logical explanation for why it could not screen its members to determine if they had pets.

      60.      Plaintiff admits the statement.

      61.      Plaintiff admits the statement.

      62.      Plaintiff admits the statement.

      63.      Plaintiff disputes the statement. VCMAX provided no reasonable explanation why it could not provide the accommodation that Plaintiff requested: that she not be required to conduct home visits for members who had pets. VCMAX merely stated that they didn't currently screen members for pets. In fact, in the same meeting, Plaintiff's supervisor began to suggest that whether or not a member had pets could be determined on a case by case basis. (Witkin Decl., Exhibit E, 499-510). VCMAX failed to do what was required of them under ADA.

      64.      Plaintiff admits the statement.

65. Plaintiff admits the statement.

66. Plaintiff admits the statement. On October 2, 2017, VCMAX ended the interactive process and refused to offer an alternative accommodation that it considered reasonable for Plaintiff.

67. Plaintiff admits the statement. Plaintiff responded to Pam White's October 6, 2017 email on October 11, 2017 and October 17, 2017, with additional information about her treatment plan. Plaintiff informed White that her treatment plan would be ongoing, as stated by her doctor. Plaintiff informed White that it was possible the treatment would allow Plaintiff to be exposed to her triggers. Plaintiff also informed White that she was still working. In her October 11th email, Plaintiff asked that White clarify if any additional medical documentation was needed. White did not respond to this inquiry. (Clancy Decl., Ex. T, Plaintiff's Response to White's Oct. 6 Email) VC000413-414; VC000480-484)

68. Plaintiff was never informed of any deficiencies in the medical documentation she provided, despite asking HR specifically if any additional information was needed. Plaintiff was never informed that providing a medical release form to CareWorks was necessary to evaluate her accommodation request. (See ¶67). In fact, in the September 27, 2017 meeting, Pam White stated, Juan Pichardo had forwarded all the necessary information onto CareWorks and that they did start the process, "but then internally, there's some checks and some things that we have to make sure of internally first." (Witkin Decl., Exhibit E, 53-56). Neither in September 27, 2017 meeting, nor in any of White's subsequent communications with Plaintiff, did White instruct Plaintiff to submit additional documentation to CareWorks. Furthermore, <u>Plaintiff's medical condition is not at issue</u>.

**VCMAX Retaliatory Performance Audits**

69. Prior to her request for accommodations, Plaintiff never had any performance issues. Plaintiff's supervisors, Donna Langaigne and Michelle Clickner, targeted Plaintiff for increased scrutiny of her performance and intentionally sabotaged her performance by scheduling meetings they knew she could not attend. (Sivio Dep., pp 260:3-264:21). Furthermore, Plaintiff called into telephonic meetings scheduled by her supervisors, and her calls went to voicemail. Plaintiff also contends that her supervisors frequently scheduled meetings and phone calls on days she was in the field, when they knew she would be unable to return their calls (Sivio Dep., p. 282:2-14; p. 310:4-13).

70. Plaintiff disputes the statement. See ¶69.

71. VCMAX provides no evidence of a random audit performed on Plaintiff's performance prior to her request for accommodations. VCMAX provides no evidence of the uniform application of its audits. Plaintiff contends the supposedly failed audit results lacked merit and were made in retaliation for her request for accommodations. (Sivio Dep., pp 260:3-264:21).

72. Plaintiff disputes the statement. See ¶71

73. Plaintiff disputes the statement. See ¶71.

74. Plaintiff disputes the statement. See ¶71.

75. Plaintiff disputes the statement. See ¶71.

76. Plaintiff reported to the 120 Broadway office on October 17, 2017. Subsequently, Plaintiff was permitted to return to working from home because after review, the results of the audit were not deemed to warrant disciplinary action. (Sivio Dep., 317:12-18).

**EEOC Charge Filed on October 18, 2017**

77. Plaintiff admits the statement.

78. Plaintiff admits the statement.

**VCMAX's Abandonment of the Interactive Dialogue Process**

79. Plaintiff admits the statement.

80. Plaintiff admits the statement.

81. Plaintiff admits the statement.

82. Defendant is incorrect. <u>Plaintiff's doctor's note did **not** state that she could no longer visit members' homes</u>. Rather, it stated that Plaintiff should be permitted to avoid exposure to her triggers which would mean exposure to pets. Plaintiff's doctor's note suggests that Plaintiff could be accommodated if VCMAX by being relieved of the requirement of visiting members' homes that have pets. Plaintiff's doctor's note further stated that Plaintiff was undergoing an <u>intensive treatment plan</u> in order to allow her to be exposed to her triggers. (Clancy Decl,, Exhibit E). Furthermore, White gave Plaintiff only one day to respond to her letter. White exhibited bad faith by demanding that Plaintiff offer <u>another</u> accommodation within one day, even though she had already offered numerous accommodations. Furthermore, after receiving White's letter, Plaintiff attempted to call White numerous times with no answer (Enza Dep., pp. 271:8-272:15; 281:24-282:14).

83. Plaintiff disputes the statement. On November 9, 2017, less than a month after Plaintiff filed a charge of discrimination with the EEOC on October 18, 2017. She did nothing wrong in the interim. Plaintiff never ceased performing the duties of her job. During this period, Plaintiff continued to conduct home visits. <u>VCMAX did not fire Plaintiff for performance reasons</u>. (White Dep., 146:3-6; 344 2-347:20.) Moreover, the close chronological proximity between the EEOC charge and her termination against the backdrop of not having had any performance issues, raises the presumption that she was terminated in retaliation for going to the EEOC.