UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ENZA H. SIVIO,                                        :

                          Plaintiff,                  :    OPINION AND ORDER
          -v.-
                                                      :
                                                           18 Civ. 2408 (GBD) (GWG)
VILLAGE CARE MAX,                                     :

                          Defendant.                  :
------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

          Plaintiff Enza H. Sivio brings this suit against her former employer, Village Care Max

("VCM"), asserting claims related to her employment at VCM.  Specifically, Sivio asserts

claims under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-796 ("RA"); the Americans with

Disabilities Act of 1990, 42 U.S.C. §§ 12101 to 12213 ("ADA"); New York State Human Rights

Law, N.Y. Exec. Law §§ 290 to 297 ("NYSHRL"); and New York City Human Rights Law,

N.Y. City Admin. Code §§ 8-101 to 131 ("NYCHRL").  Before the court is VCM's motion for

summary judgment.[1]  For the reasons that follow VCM's motion is granted as to Sivio's

---

[1] See Motion for Summary Judgment, filed on Aug. 14, 2019 (Docket # 49); Rule 56.1
Statement, filed on Aug. 14, 2019 (Docket # 50) ("Def. 56.1 Statement"); Memorandum of Law
in Support of Motion for Summary Judgment, filed on Aug. 14, 2019 (Docket # 51) ("Def.
Mem."); Declaration of Eric D. Witkin in Support of Motion for Summary Judgment, filed on
Aug. 14, 2019 (Docket #52) ("Witkin Decl."); Declaration of Janice Leacock in Support of
Motion for Summary Judgment, filed on Aug. 14, 2019 (Docket # 53) ("Leacock I Decl.");
Declaration of Amparo Peterkin-White in Support of Motion for Summary Judgment, filed on
Aug. 14, 2019 (Docket # 54) ("White Decl."); Declaration of Donna Langaigne in Support of
Motion for Summary Judgment, filed on Aug. 14, 2019 (Docket # 55) ("Langaigne Decl.");
Plaintiff's Response to Defendant's Statement of Undisputed Material Facts Pursuant to FRCP
56.1, filed on Sept. 30, 2019 (Docket # 59) ("Pl. 56.1 Statement"); Declaration of Donna H.
Clancy in Opposition to Motion for Summary Judgment, filed on Sept. 30, 2019 (Docket # 60)
("Clancy Decl."); Memorandum of Law in Opposition to Motion for Summary Judgment, filed
on Oct. 1, 2019 (Docket # 61) ("Pl. Mem."); Reply Memorandum of Law in Support of
Summary Judgment, filed on Oct. 28, 2019 (Docket # 62) ("Def. Reply"); Declaration of Janice
Leacock in Support of Motion for Summary Judgment, filed on Oct. 28, 2019 (Docket # 63)
("Leacock II Decl."); Defendant's Reply to Plaintiff's Response to Defendant's 56.1 Statement,

retaliation claims, but denied as to the other claims.

I. BACKGROUND

We next recount the facts pertinent to the defendant's motion. These facts are either undisputed, unless otherwise noted, or represent plaintiff's version of the relevant facts as supported by competent evidence.[2]

A. The Parties

Defendant VCM is a non-profit organization that cares for seniors and other individuals with chronic healthcare needs. See Leacock I Decl. ¶ 2; Langaigne Decl. ¶ 2; White Decl. ¶ 2. VCM provides long-term care to customers, who are referred to as "members," by coordinating and assisting these members with various types of treatment, programs, and care. Leacock I Decl. ¶ 3; Langaigne Decl. ¶ 3; White Decl. ¶ 3. VCM has a care management department, including a director of care management, care management supervisors, care managers, care

filed on Oct. 28, 2019 (Docket # 64) ("Def. Reply to Pl. 56.1 Statement").

[2] VCM argues that we should not consider Sivio's submissions for several reasons. See Def. Reply at 2-4. First, VCM argues that we should not consider her opposition brief or Rule 56.1 statement because they are unsigned. That violation has since been corrected, however (Docket ## 67-69). Second, VCM argues that Sivio's brief violates the Court's Individual Practices requiring that citations to factual statements be contained in a brief. While the Court agrees that Sivio's memorandum is deficient in this respect, the Court has discretion to waive compliance with its Individual Practices, see, e.g., Roman v. RGS Fin., Inc., 2019 WL 4247551, at *3 (E.D.N.Y. Sept. 6, 2019) and will do so here in light of the fact that the factual contentions are clearly presented in the Sivio's statement under Local Civil Rule 56.1, see Pl. 56.1 Statement. VCM also asserts that certain contentions in that statement are not adequately supported. Def. Reply at 2-4. It is not necessary to address these contentions individually, however, because our recitation of the facts is based only on the admissible evidence submitted by Sivio or matters specifically admitted by VCM. In connection with this latter argument, we note that while it is unusual that Sivio did not submit an affidavit in support of her motion, she did submit her sworn deposition, see Sivio Dep. (annexed as Ex. A to Clancy Decl.) (Docket # 60-1), which is specifically permitted by Fed. R. Civ. P. 56(c)(1)(A).

coordinators, and nurse assessors.  See White Dep. (annexed as Ex. B to Witkin Decl.) (Docket

# 52-2) 56:10-59:04.  Plaintiff Sivio was employed as a care manager at VCM from April 10,

2017 to November 9, 2017.  New Employee Onboarding Checklist, dated April 10, 2017

(annexed as Ex. 3 to Leacock I Decl.) (Docket # 53-3); Email from White to Sivio, dated Nov. 9

2017 (annexed as Ex. 10 to White Decl.) (Docket # 54-10).

     B. Sivio's Responsibilities as a Care Manager

     The parties dispute the job responsibilities of a care manager.  See Def. Reply to Pl. 56.1

Statement ¶ 4.  VCM asserts the responsibilities of care managers "included home visits to

assess the patient (member), documentation of patient visits, and follow-up calls."  See Def.

Reply to Pl. 56.1 Statement ¶ 4; Leacock Decl. ¶ 4; White Dep. 62:3-62:8; 64:24-65:4.  Sivio

states she was offered a position as a "telephonic nurse care manager," which was a type of care

manager that conducts telephonic assessment of members but does not perform home visits or

other field assessments.  See Pl. 56.1 Statement ¶ 4; Sivio Dep. 41:17-47:14; id. 57:11-58:3;

Clickner Dep. (annexed as Ex. C to Clancy Decl.) (Docket # 60-3) 103:14-24.

     The care manager job description contained in the application that Sivio digitally signed

on March 9, 2017, explains that "assessments will be conducted in the member's home or

telephonic" and that one of the job requirements was travel within New York City.

See Application, filed on Aug. 14, 2019 (annexed as Ex. 1 to Leacock I Decl.) (Docket # 53-1) at

4.[3]  During orientation for her new position on April 10, 2017, Sivio was presented with a job

description, which VCM asked her to sign.  Leacock I Decl. ¶ 10.  That description stated "some

---

    [3] It is disputed whether Sivio filled out the online application before or after her
interview for the position, but Sivio does not dispute that she ultimately filled out the online
application.  Pl. 56.1 Statement ¶ 22.

portions (less than 50%) of daily assignments require travel to Client/resident/patient locations or other work sites" Position Summary, filed on Aug. 14, 2019 (annexed as Ex. 4 to Leacock 1 Decl.) (Docket # 53-4). Sivio voiced concern that she would not be able to travel to client locations because of her allergies, Sivio Dep. 102:13-18, but was told by VCM orientation staff that it was "not an issue" and that she didn't "have to worry about it," id. 103:3-10. Later, as part of her orientation, Sivio "satisfactorily" conducted a home visit assessment on May 9, 2017. Id. 117:12-124:45; 25:24-130:3.

The parties dispute how often Sivio performed home visits once she began her job as a care manager. See Def. Reply to Pl. 56.1 Statement ¶ 30. Sivio asserts care managers spent the majority of their day making phone calls, rather than performing home visits. Clickner Dep. 54:23-55:13. VCM contends that Sivio was required to perform home visits regularly. Leacock I Decl. Exs. 5-10, filed on Aug. 14, 2019 (Dockets ## 53-5 through 53-10).

Care managers such as Sivio were overseen by "care manager supervisors." See Def. Reply to Pl. 56.1 Statement ¶ 12. Sivio was managed by two supervisors: Michelle Clickner and Donna Langaigne. Id. ¶¶ 9-11. Care manager supervisors such as Clickner and Langaigne were required to, inter alia, complete randomized audits of the care managers they supervised. See Langaigne Decl. ¶ 8; Clickner Dep. 78:18-78:20; id. 95:24-96:4.[4] If the supervisors' audit revealed that a care manager was not following VCM procedures or rules, the care manager could be subject to discipline, such as placement on a performance improvement plan. See Langaigne Decl. ¶ 9. Additionally, if an audit revealed non-compliance with procedures or

_____

[4] Sivio's 56.1 statement states VCM has "failed to provide evidence that the practice of conducting random audits was uniformly applied" but does not otherwise dispute that one of the responsibilities of care manager supervisors was conducting audits of care managers. Pl. 56.1 Statement ¶ 13.

rules, the care manager could be subject to more frequent audits in the future, at the discretion of the supervisor. Langaigne Decl. ¶ 10. Poor audit results could also cause care managers to be required to work out of VCM's home office, where they could presumably be more closely supervised. White Dep. 60:17-60:19.

C. <u>Sivio's Disability</u>

Sivio suffers from pet allergies and asthma. <u>See</u> Drullinsky Medical Note, filed on Sept. 30, 2019 (annexed as Ex. F to Clancy Decl.) (Docket # 60-6). When she is exposed to asthma triggers such as pets, "she can have severe exacerbation of her asthma that may require hospitalization." <u>Id.</u> Prior to her employment at VCM, Sivio treated her asthma using solely an albuterol inhaler. Sivio Dep. 67:19-68:18. However, after exposure to pets during home visits for VCM members, Sivio began a more extensive treatment plan that includes multiple medications and allergen immunotherapy. Sivio Dep. 244:10-247:8.

D. <u>Sivio's Home Visits</u>

While employed as a care manager at VCM, Sivio made home visits to members who had pets. Def. Reply to Pl. 56.1 Statement ¶ 32. After making visits to homes with pets, Sivio experienced acute asthma attacks, became itchy, and began to wheeze. <u>Id.</u> To respond to these attacks, Sivio took Prednisone, Advair, Singular, Ventolin, and used a nebulizer. <u>Id.</u> ¶ 33. On July 28, 2017, Langaigne emailed Michelle Clickner, another one of Sivio's supervisors, stating that Sivio had "notified [her] that she has allergies to pets and is unable to make visits to members who have pets." <u>Id.</u> ¶ 35. Langaigne asked Clicker if they could "discuss possible plans on how to proceed with this?" <u>Id.</u> That same day, Langaigne met with VCM's Vice President of Human Resources, Pam White, to discuss Sivio's alleged inability to visits members

who have pets and what accommodations would be possible.  White Dep. 137:23-138:2, 140:9-140:19.  On August 24, 2017, Sivio told her supervisors that she could not enter homes with pets, and asked that her clients with pets be reassigned to other case managers.  Def. Reply to Pl. 56.1 Statement ¶ 45.  Sivio subsequently provided a letter from her doctor on August 31, 2017, which indicated she suffers from severe asthma and multiple allergies including pets.  Witkin Decl. Ex. G.

A medical assessment of Sivio's requested accommodation was conducted by CareWorks, a third-party leave administrator that reviews medical documentation of employees who request leave or accommodations.  Def. Reply to Pl. 56.1 Statement ¶ 47.  On September 1, 2017, a nurse from CareWorks e-mailed Sivio a medical form to complete within 15 days so that CareWorks could assess Sivio's requested accommodation.  Id. ¶ 48.  Sivio did not provide the medical documentation to CareWorks, but she did provide the requested medical information to VCM's human resources department.  White Decl. ¶ 9; id. Ex. 2.

Later in September, VCM's human resources team had a conversation to discuss the possibility of screening members for pets but came to the conclusion it was not possible to include information about pets in their assessment of members.  Def. Reply to Pl. 56.1 Statement ¶ 50.  On September 26, 2017, Sivio had a meeting with her supervisors, human resources Vice President Pam White, and another human resources representative, Juan Pichardo.  Id. ¶ 54.  During this meeting, White told Sivio that VCM could not grant her request that she only be assigned to home visits with members who did not have pets.  Id. ¶ 56.  White stated the request could not be granted because VCM did not categorize members by whether or not they had pets.  Id. ¶ 57.  Instead, White explained, members are assigned to care managers based on the

language they speak and the location of the member's home.  Id. ¶ 58.  White also stated that

VCM's purpose is to service their members, and "pets are not a main function of what they do."

Id. ¶ 59.  White suggested that Sivio meet with her doctor again to explore possible treatment or

accommodations for her asthma.  Id. ¶ 60.  Sivio was instructed to follow up with White by

October 9, 2017 regarding her medication condition.  Id. ¶ 61.  If Sivio did not follow up with

White, the parties agreed White would assume Sivio no longer needed an accommodation and

the issue would be considered resolved.  Id.  The parties further agreed that Sivio had until

October 9, 2017 to inform White if she needed more time to consult with a doctor.  Id. ¶ 62.

White explained that VCM's position was that Sivio had already requested an accommodation

that she not be required to go to the homes of members with pets, that request was denied, and

Sivio would need to propose a different accommodation.  Id. ¶ 63.[5]

On September 27, 2017, Sivio provided VCM with a second letter from her doctor.  Id.

¶ 64.  The letter stated Sivio:

> has been off medications until recently when started working as a nurse that does
> home health assessments now on days she is at work she requires Advair 500/50
> BID, Ventolin, singular and upwards of 80-100 mg prednisone a day. She suffers
> from year round allergic symptoms as well.  She also breaks out in hives in these
> homes . . . On allergen skin testing she is highly allergic to dust mites, cat, dog,
> grass pollen, ragweed pollen, tree pollen, cockroaches and mold.  Many of these
> allergens are indoor perennial allergens and likely in her work environment . . . .
> She needs to avoid these environments due to the severity of her asthma . . . .

Id.  On September 29, 2017, Sivio called out from work sick because she suffered an asthma

attack after completing a home visit.  Id. ¶ 65.  On October 2, 2017, VCM sent a letter to Sivio

---

[5] Sivio claims to dispute this statement but provides no evidence that White did not in
fact give this explanation to her at the September 26, 2017, meeting.  Pl. 56.1 Statement ¶ 63.
Instead, she asserts that VCM provided no "reasonable explanation" of why it could not provide
the accommodation she requested.  Our description of White's statement, however, does not
assume that the assertions by White are true.

stating they were unable to comply with Sivio's requested accommodation that she "not go into member's houses where there are pets" because "one of the essential functions of the Care Manager role is to make home visits to members homes" and VCM "assigns Care Mangers to a member case load based on location and language." See Letter from White to Sivio, dated October 2, 2017 (annexed as Ex. 4 to White Decl.) (Docket # 54-4). On October 6, 2017, White sent a letter to Sivio explaining that VCM had forwarded the second letter from her doctor to CareWorks. Def. Reply to Pl. 56.1 Statement ¶ 67. White's letter further requested that Sivio provide additional information about the specifics of her treatment plan including its length, her asthma triggers, and whether she was currently working. Id.

E. Sivio's Termination from VCM

The parties present different accounts of Sivio's performance prior to her termination from VCM. See Def. Reply to Pl. 56.1 Statement ¶¶ 69-76, 79-83. VCM's account is that prior to the September 26, 2017 meeting between Sivio, her supervisors, and White, Sivio had not been completing all of her care manager responsibilities. Id. ¶ 69. As an example, Sivio sometimes failed to return phone calls or emails. Id. In August 2017, Sivio's supervisor performed a random audit of her assignments and found she had failed to make member calls that were assigned to her. Id. ¶ 72. On September 18, 2017, Sivio's supervisor emailed her because Sivio had not been responding to telephone messages. Id. ¶ 70. A second audit in September 2017 revealed that Sivio had failed to make 41 of the 78 monthly calls she was required to make in September. Id. ¶ 74. VCM attempted to contact Sivio to discuss the audit results but Sivio consistently called out sick. Id. ¶ 75. On October 12, 2017, one of Sivio's supervisors emailed Sivio and explained that Sivio had missed multiple telephonic meetings to

8

discuss the audit results and was consequently assigned to work at the VCM home office until further notice.  Id. ¶ 76.  Sivio was also referred to VCM's Training and Development Department on October 16, 2017, to start clinical orientation, and was required to use an activity log for the month of November.  Id. ¶ 74.

Sivio provides no evidence disputing any of these matters, see Pl. 56.1 Statement ¶¶ 69-76, but avers that VCM "provides no evidence of a random audit performed on Plaintiff's performance prior to her request for accommodations."  Id. ¶ 71 (emphasis added); accord id. ¶ 69.  Sivio further asserts that her supervisors targeted her for increased scrutiny and intentionally sabotaged her performance by scheduling meetings they knew she could not attend. Id.; see also Sivio Dep. 260:3-264:21; 282:2-14; 310:4-13.

On October 20, 2017, White sent Sivio an email stating that visiting members' homes was a vital function of her role as a case manager.  Def. Reply to Pl. 56.1 Statement ¶ 79. White's email further requested that Sivio provide more information about the accommodation she was requesting from VCM.  Id.  White sent a second email on October 27, 2017, asking Sivio to respond by November 3, 2017 and again asking for more information about a reasonable accommodation for Sivio.  Id. ¶ 80.  Sivio replied to White's email on November 3, 2017 and asked "what else you may need from me."  Id. ¶ 81.  On November 6, 2017, White emailed Sivio and stated that Sivio's September 27, 2017 doctor's note made clear that Sivio could no longer make visits to members' homes, which the letter asserted was an essential function of Sivio's role as a care manager.  Id. ¶ 82.  Again, White requested more information be provided — this time within 24 hours — about what reasonable accommodation was being sought by Sivio.  Id.

¶ 82.[6]  On November 9, 2017, White contacted Sivio via email and stated VCM had terminated Sivio's employment because she could no longer perform the essential functions of her job.  Id. ¶ 83.[7]

F. Procedural History

In the meantime, in October 2017, Sivio filed a charge with the Equal Employment Opportunity Commission ("EEOC").  Def. Reply to Pl. 56.1 Statement ¶ 77.  The EEOC issued a "Notice of Charge of Discrimination" on October 18, 2017.  Id. ¶ 78.  Sivio filed the original complaint in this action pro se on March 16, 2018.  See Complaint, filed on March 16, 2018 (Docket # 1).  VCM filed their answer to the complaint on June 11, 2018, see Docket # 10.  Sivio requested leave to file an amended complaint on December 3, 2018, see Docket # 30, and leave was granted on December 19, 2018, see Docket # 34.  While Sivio never actually filed the amended complaint, given Sivio's pro se status at the time, we treat the proposed amended complaint as the operative pleading.  On May 30, 2019, an attorney appeared on Sivio's behalf.  See Notice of Appearance by Donna H. Clancy, filed on May 30, 2019 (Docket # 48).  VCM filed the instant motion on August 14, 2019.

II. SUMMARY JUDGMENT STANDARD

_____

[6]  Sivio disputes that the September 27, 2017 doctor's note indicates she could no longer make home visits and states that she repeatedly attempted to call White in response to the email, but does not otherwise dispute the contents of the November 6, 2017 email.  See Pl. 56.1 Statement ¶ 82; see also Sivio Dep. 271:8-272:15; 281:24-282:14.

[7]  Sivio purports to dispute this statement, contending that VCM "did not fire Plaintiff for performance reasons."  Pl. 56.1 Statement ¶ 83.  However, VCM did not contend she was fired for performance reasons — apart from her inability to perform the essential functions of her job.  Moreover, the only evidence cited by Sivio, id., is testimony of White, which is consistent with the VCM's contention that Sivio was told she was terminated for not performing the essential functions of her job.

A court must granting summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997); see also Fed. R. Civ. P. 56(c)(4) (parties shall "set out facts that would be admissible in evidence.").

In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party. Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)). Once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original) (citation omitted) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor," Anderson, 477 U.S. at 256, and "[a] party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory," Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008). "Where it is clear that no rational finder of fact 'could find in favor of the

nonmoving party because the evidence to support its case is so slight,' summary judgment

should be granted." FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting

Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

III. DISCUSSION

Sivio brings claims under various state and federal statutes asserting that VCM: 1) failed

to accommodate her disability, 2) otherwise discriminated against her because of her disability,

and 3) retaliated against her for filing an EEOC complaint.[8]  We address these claims in turn.

A. Accommodation Claims (ADA, RA, NYSHRL, and NYCHRL)

1. Reasonable Accommodation

To establish a prima facie claim for failure to accommodate under the ADA, a plaintiff

must make the following showing:

> (1) plaintiff is a person with a disability under the meaning of the [statute]; (2) an
> employer covered by the statute had notice of his disability; (3) with reasonable
> accommodation, plaintiff could perform the essential functions of the job at issue;
> and (4) the employer has refused to make such accommodations.

McBride v. BIC Consumer Products Mfg. Co., Inc., 583 F.3d 92, 97 (2d Cir. 2009) (citation and

punctuation omitted).  The same prima facie standard applies to claims under the RA, NYSHRL

and NYCRL.  See, e.g., Lawtone-Bowles v. City of N. Y., 2019 WL 652593, at *6 (S.D.N.Y.

Feb. 15, 2019)  ("Courts apply the same standard for failure to accommodate cases under the

ADA, Rehabilitation Act, NYSHRL, and NYCHRL.").  "[O]nce Plaintiff puts forth a prima facie

---

[8]  The Amended Complaint arguably makes claims regarding differential treatment and a
hostile work environment.  While VCM moved for summary judgment on any claims in the
Amended Complaint beyond the accommodation, discrimination and retaliation claims, see Def.
Mem. at 35-36, Sivio's opposition brief makes no argument that any such claims exist, let alone
opposing their dismissal.  We thus construe the Amended Complaint as containing no additional
claims.

case, the burden shifts to the employer to demonstrate that the employee's proposed accommodation would result in an undue hardship." Scalera v. Electrograph Sys., Inc., 848 F. Supp. 2d 352, 360 (E.D.N.Y. 2012) (citing Stone v. City of Mount Vernon, 118 F.3d 92, 97 (2d Cir. 1997)); 42 U.S.C. § 12112(b)(5)(A) (employer prohibited from "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity").

Regarding the third element, a "reasonable accommodation is one that 'enable[s] an individual with a disability who is qualified to perform the essential functions of that position . . . [or] to enjoy equal benefits and privileges of employment.'" Noll v. Int'l Bus. Machines Corp., 787 F.3d 89, 94 (2d Cir. 2015) (quoting 29 C.F.R. § 1630.2(o)(1)). The reasonable accommodation determination "is necessarily fact-specific." Wernick v. Fed. Reserve Bank of N. Y., 91 F.3d 379, 385 (2d Cir. 1996). Reasonable accommodations can include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). However, a "reasonable accommodation can never involve the elimination of an essential function of a job." Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003) (citing Gilbert v. Frank, 949 F.2d 637, 642 (2d Cir. 1991)). Essential functions are "'fundamental' duties to be performed in the position in question, as opposed to functions that

are merely 'marginal.'" Id. (quoting Stone, 118 F.3d at 97). "Although a court will give considerable deference to an employer's determination as to what functions are essential, there are a number of relevant factors that may influence a court's ultimate conclusion as to a position's essential functions." Millan v. City of N. Y., 711 F.3d 120, 126 (2d Cir. 2013) (citing Stone, 118 F.3d at 97).

The EEOC has promulgated regulations relating to whether a function is essential to a job. "While these regulations are not binding, they provide [courts] with guidance in interpreting the ADA." Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 870 (2d Cir. 1998). The regulations consider the following factors in determining whether a function is essential to a job:

> (2) A job function may be considered essential for any of several reasons, including but not limited to the following:
>
> (i) The function may be essential because the reason the position exists is to perform that function;
>
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.
>
> (3) Evidence of whether a particular function is essential includes, but is not limited to:
>
> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;

14

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n). "Plainly, the considerations set out in this regulation are fact-intensive. Usually no one listed factor will be dispositive, and the regulations themselves state that the evidentiary examples provided are not meant to be exhaustive." Stone, 118 F.3d at 97.

Even if an accommodation does not eliminate an essential function, and is therefore reasonable, an employer can escape liability under a failure to accommodate claim if the proposed accommodation results in an "undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A). "'Undue' hardship, like 'reasonable' accommodation, is a relational term; as such, it looks not merely to the costs that the employer is asked to assume, but also the benefits to others that will result." Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 139 (2d Cir. 1995). An undue hardship is defined by the ADA as "an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B)." 42 U.S.C. § 12111(10). The relevant subparagraph (B) factors are:

(i) the nature and cost of the accommodation needed under this chapter;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

Id.

Here, VCM does not dispute that Sivio has fulfilled the first and second elements of her failure to accommodate claim. See Def. Mem. at 17. Thus, our failure to accommodate analysis is confined to the third and fourth elements of the claim: that is, (3) whether Sivio could perform the essential functions of her role with a reasonable accommodation and (4) whether VCM failed to provide that accommodation. VCM argues that Sivio's failure to accommodate claim fails because 1) she could not perform home visits, which were an essential function of her job, even with a reasonable accommodation, Def. Mem. at 17-20; 2) Sivio's requested accommodation of not performing home visits was not reasonable because it eliminated an essential function of the care manager job, id. at 20-22; 3) the requested accommodation — identified by VCM as not conducting home visits — would impose an "undue burden" on VCM, id. at 23-25; and 4) Sivio's abandonment of the interactive accommodation process necessitates dismissal of her failure to accommodate claim, id. at 25-27.

At the outset, we note that VCM's arguments are premised on the assumption that Sivio's proposed accommodation was to be excused from all home visits. Thus, VCM argues at length that home visits were an "essential function" of Sivio's job. Def. Mem. at 17-23. In fact, Sivio repeatedly requested a far more limited accommodation: specifically, to not be required to conduct home visits for members with pets. See, e.g., September 26, 2017 Meeting Transcript, filed on Aug. 14, 2019 (annexed as Ex. E to Witkin Decl.) (Docket # 52-5) at 8:222-225 (Sivio asked "if she could not have to go to the houses that have pets because a few of the places she's been to have pets and she has asthma."). VCM has conceded that Sivio requested this specific accommodation. See Def. Reply at 4 ("Plaintiff's deposition testimony, proves her only

requested accommodation was to no longer be required to go into members' homes that had pets."). Because, as explained below, VCM is not entitled to summary judgment on the question of whether such an accommodation was reasonable, it is not necessary to determine whether other accommodations — such as not performing home visits at all — would have been reasonable.

In support of the reasonableness of her requested accommodation, Sivio points to testimony that she herself was allowed to call members to determine if they had pets and that she was able to keep a spreadsheet of such members. See Pl. 56.1 ¶ 51 (citing Sivio Dep. at 166-168). She points to evidence that there was already some screening done to determine if members had pets and that it would not have been difficult to swap assignments with care mangers who didn't have allergies. Id. ¶ 4(i) (citing Sivio Dep. at 139-14, 149-152, 327-28).[9] Thus, there is a genuine issue of material fact as to whether permitting Sivio to conduct home visits only on members without pets would have been a reasonable accommodation. Or to put it in other terms, a reasonable jury could conclude that conducting home visits for members with pets was not an essential function of Sivio's role as a care manager. See Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1136 (9th Cir. 2001) (denying summary judgment where there was "a triable issue of fact as to whether [plaintiff] would have been able to perform the essential duties of her job with the accommodation"). The burden now shifts to VCM to show that Sivio's

---

[9] Sivio also points to evidence that there were various other accommodations VCM could make to prevent her from having to visit members' homes with pets that did not require her to conduct home visits at all. See Pl. 56.1 Statement ¶¶ 4(iii), 4(iv), 4(v), 38-43. For example, Sivio states she was offered a position as a "telephonic nurse care manager," which was a type of care manager that conducts telephonic assessment of members but does not perform home visits or other field assessments. See Sivio Dep. 41:17-47:14; id. 57:11-58:3; Clickner Dep. 103:14-24.

proposed accommodation would impose an "undue hardship" on it.  <u>Scalera</u>, 848 F. Supp. 2d at 360.

On the issue of whether VCM could have accommodated Sivio without "undue hardship" by having Sivio visit only client homes without pets, VCM has offered little evidence.  The entirety of its evidence on this point, as cited in its Rule 56.1 Statement, ¶¶ 50-51, is confined to testimony from White.  First, VCM points to the following testimony at White's deposition, <u>see id.</u>:

> Q. Who determined that it wouldn't be possible for VillageCare to screen members for pets?
>
> A. We had had a conversation with — I know that it was with the care management leadership because when, I believe — and I don't know — let me say that I don't remember exactly the specific reasons, like, surrounding it.  But I know that, when we did have a discussion about it, it was something along the lines of that the patient, whether or not they have pets is not the main determining factor it's not information that they would be collecting in terms of, like, an intake type of thing.  It wouldn't be part of the intake because it's not a primary — if I'm not mistaken, it's not a primary essential issue unless it was something that they raise.  It's not like a primary essential issue, like, in the treatment plan — like, so it wouldn't be something that would be kind of assessed or looked at, whether or not the person had a pet, unless it was something that was related to the person's, you know, having a cat — or the person has had one because of a cat.  Then I guess that would be in there.  But not whether or not this person has a pet wouldn't necessarily be a question.  I guess that information would be kind of relayed in the treatment plan itself.  That information would be relayed in the treatment plan itself.

White Dep. at 224-25.  VCM also points to the following statement in White's declaration, <u>see</u> Def. 56.1 Statement ¶ 51:

> In 2017, it was not possible for VCMAX to permit a Care Manager to call ahead to determine if there were pets in a member's home because having a pet was not one of the criteria that VCMAX used to determine whether or not they would provide services, and they would not have this information in advance of servicing a member.  Further, this type of screening also would have required VCMAX to screen for whether members had service animals, which, given the

18

population VCMAX services, would have altered their business model.

White Decl. ¶ 5.[10]

There are many problems with VCM's reliance on this testimony. First, there is no indication that White's testimony is based on her own personal knowledge. Indeed, in her deposition testimony she specifically refers to conversations with "care management leadership" and is equivocal in describing those conversations, with repeated use of phrases such as "I guess." White Dep. at 224. White herself was in the human resources department, not in the care management department. See White Decl. ¶ 1. In her deposition, she was not even sure of the name of the department or the specifics of its functions. White Dep. at 56-57. Moreover, her affidavit suggests only that VCM did not actually keep records in 2017 as to pet ownership. It does not explain what hardship would have been imposed on VCM to determine the pet ownership of members for purposes of allowing Sivio to determine which homes to visit, let alone explain why that hardship was "undue." Thus, VCM has failed to meet its burden of showing "special . . . circumstances demonstrating undue hardship in the particular circumstances." See U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 402 (2002).

2. Interactive Process

VCM argues that Sivio abandoned the "interactive process" of determining a reasonable accommodation and, consequently, her failure to accommodate claim must be dismissed. Def. Mem. at 25-27. As the Second Circuit has noted, "[t]he ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability

_____

[10] White also told Sivio similar statements during the September 26, 2017 meeting. See Def. 56.1 ¶¶ 56-59. These are not sworn statements by White, however, and thus cannot support VCM's motion for summary judgment. In any event, they offer no more detail.

19

can be reasonably accommodated." Jackan v. N.Y.S. Dep't of Labor, 205 F.3d 562, 566 (2d Cir. 2000) (citing 29 C.F.R. § 1630.2(o )(3)); see also Lovejoy–Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 218-19 (2d Cir. 2001).  The purpose of the interactive process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." Noel v. BNY-Mellon Corp., 2011 WL 4633884, at *2 (S.D.N.Y. Oct. 4, 2011) (citing 29 C.F.R. § 1630.2(o)(3)), aff'd, 514 F. App'x 9 (2d Cir. 2013). The New York State and City Human Rights Laws have an identical requirement.  See Phillips v. City of N. Y., 66 A.D.3d 170, 176 (1st Dep't 2009) ("[U]nder the broader protections afforded by the State and City HRLs, the first step in providing a reasonable accommodation is to engage in a good faith interactive process that assesses the needs of the disabled individual and the reasonableness of the accommodation requested.").

`It has been further held that "[a]n employee who is responsible for the breakdown of that interactive process may not recover for a failure to accommodate." Nugent v. St. Lukes–Roosevelt Hosp. Ctr., 303 F. App'x 943, 945-46 (2d Cir. 2008); accord Berger v. N. Y. City Police Dept., 304 F. Supp. 3d 360, 371 (S.D.N.Y. 2018) ("[i]f an employer has made reasonable efforts to communicate with an employee, or if the employee causes the interactive process to collapse, an employer will not be liable for failing to make an accommodation under the ADA") (internal citation and quotation marks omitted).  However, a employee may still recover under a failure to accommodate claim where "the defendant's policies 'foreclosed the only reasonable accommodation that could have assisted plaintiffs,' and . . . defendant's statements 'effectively indicated that the [defendant] had no intention of engaging in the interactive process in good faith with [the plaintiff].'" Fair Hous. Justice Ctr., Inc. v. Cuomo,

2019 WL 4805550, at *14 (S.D.N.Y. Sept. 30, 2019) (quoting <u>Davoll v. Webb</u>, 194 F.3d 1116,

1133 (10th Cir. 1999)).  In considering a claim regarding a breakdown in the interactive process,

"'courts should attempt to isolate the cause of the breakdown [of the interactive process] and

then assign responsibility.'"  <u>Zito v. Donahoe</u>, 915 F. Supp. 2d 440, 446 (S.D.N.Y. 2012)

(quoting <u>Beck v. Univ. of Wis. Bd. of Regents</u>, 75 F.3d 1130, 1135-36 (7th Cir. 1996)).

 Here, we cannot say that a reasonable jury would be required to find that Sivio was

responsible for any breakdown in the interactive process.  During the September 26, 2017

meeting — attended by Sivio, her supervisors, human resources Vice President Pam White, and

another human resources representative named Juan Pichardo — Sivio was told by White that

VCM could not grant her request that she only be assigned to home visits with members who did

not have pets.  Def. Reply to Pl. 56.1 Statement ¶¶ 54, 56.  White then suggested Sivio meet with

her doctor and come up with alternative possible accommodations.  <u>Id.</u> ¶ 60.  All instances in

which VCM alleges Sivio failed to engage in the interactive process occurred after the

September 26, 2017 meeting.  <u>See</u>, <u>e.g.</u>, <u>id.</u> ¶ 82 (referring to November 6, 2017, letter to Sivio

in which White "requested more information about which reasonable accommodation she was

seeking").

 Given VCM's denial of Sivio's request at the September 26, 2017 meeting that she no

longer be assigned to home visits for members with pets, coupled with the fact that VCM made

clear that her job required home visits, <u>see</u> October 2, 2017 Letter from White to Sivio, a

reasonable jury could conclude that this is "the rare case where an employer has essentially

foreclosed the interactive process through its policies or explicit actions."  <u>Hampson v. State</u>

<u>Farm Mut. Auto Ins. Co.</u>, 2015 WL 12733387, at *13 (N.D.N.Y. Mar. 26, 2015) (citing <u>Davoll</u>,

194 F.3d at 1133).  Thus, Sivio's failure to respond to VCM's subsequent vague requests for an alternative "reasonable accommodation," id., did not frustrate the purpose of the interactive process — which is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations," Noel, 2011 WL 4633884, at *2.  Sivio's allergy-related limitation of being unable to enter the homes of members who owned pets, as indicated by the two doctor's notes Sivio had provided to VCM, was already known to VCM at the point they denied her "no pets" request.  See Def. Reply to Pl. 56.1 Statement ¶¶ 46 (Aug. 31, 2017 letter), 64 (Sept. 27, 2017 letter).  Viewing the evidence in the light most favorable to Sivio — the non-moving party — and granting her all reasonable inferences, a reasonable jury could conclude Sivio did not abandon the interactive process when she only intermittently replied to messages from her employer requesting alternative reasonable accommodation suggestions, given that her employer had declined the only accommodation that would permit Sivio to continue her employment.

This case is therefore distinguishable from the cases cited by VCM, Def. Mem. at 25-26, in which the employer was open to providing options that potentially could accommodate the employee's disability.  See Elmessaoudi v. Mark 2 Rest. LLC, 2016 WL 4992582, at *8 (S.D.N.Y. Sept. 15, 2016) ("[E]mployer immediately granted Plaintiff the schedule accommodation he requested.  While Plaintiff now contends that the accommodation granted was inadequate, he never brought this alleged inadequacy to the employer's attention at the time, even though the employer had made clear that it would grant whatever accommodation was necessary to permit Plaintiff to attend his therapy sessions."); Durick v. N.Y.C. Dep't of Educ., 202 F. Supp. 3d 277, 290 (E.D.N.Y. 2016) ("[P]laintiff's failure to submit to the [interactive]

process was not because of the unreasonableness of [employer's] request. Plaintiff conceded during her deposition that she did not attend a medical examination because she had already decided to retire.").

Here, because a reasonable jury could conclude either that Sivio did not abandon the interactive process, or that she abandoned the interactive process after VCM had already improperly denied a reasonable accommodation, her failure to accommodate claim survives summary judgment.

B. Discrimination Claims (ADA, RA, NYSHRL, and NYCHRL)

Claims of discrimination under the ADA, RA, and NYSHRL are analyzed under the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998) (ADA); Kerman–Mastour v. Fin. Indus. Regulatory Auth., Inc., 814 F. Supp. 2d 355, 366 (S.D.N.Y. 2011) (NYCHRL); Mittl v. N. Y. State Div. of Human Rights, 100 N.Y.2d 326, 330 (2003) (NYSHRL); Gentile v. Potter, 509 F. Supp. 2d 221, 232 (E.D.N.Y. 2007) (citing Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48–49 (2d Cir. 2002)) (RA).[11] Under McDonnell Douglas, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. See Green, 411 U.S. at 802; accord St. Mary's Honor Ctr. v. Hicks,

---

[11] "[W]hile it is unclear whether McDonnell Douglas continues to apply to NYCHRL claims and, if so, to what extent it applies, the question is also less important because the NYCHRL simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 (2d Cir. 2013). Because, for reasons discussed below, Sivio has met that more stringent standard here, her NYCHRL claim necessarily also survives summary judgment. See Makinen v. City of N. Y., 30 N.Y.3d 81, 89 (2017) ("[T]he state and federal human rights" laws are "floors below which the NYCHRL should not fall . . . .").

509 U.S. 502, 506 (1993); <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981);

<u>Joseph v. Leavitt</u>, 465 F.3d 87, 90 (2d Cir. 2006) (quoting <u>James v. N. Y. Racing Ass'n</u>, 233

F.3d 149, 154 (2d Cir. 2000)).  This burden has been characterized as "minimal."  <u>McPherson v.

N.Y. C. Dep't of Educ.</u>, 457 F.3d 211, 215 (2d Cir. 2006) (citations omitted); <u>Woodman v.

WWOR-TV, Inc.</u>, 411 F.3d 69, 76 (2d Cir. 2005).

To establish a <u>prima</u> <u>facie</u> case of disparate treatment under the ADA, a plaintiff must

demonstrate that: "(1) [her] employer is subject to the ADA; (2) [s]he was disabled within the

meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of

h[er] job, with or without reasonable accommodation; and (4) [s]he suffered adverse

employment action because of h[er] disability."  <u>Sista v. CDC Ixis N. Am., Inc.</u>, 445 F.3d 161,

169 (2d Cir. 2006) (quoting <u>Giordano v. City of N. Y.</u>, 274 F.3d 740, 747 (2d Cir. 2001)).  The

same requirements apply to the RA and the NYSHRL.  <u>See</u> <u>Wallace v. Esper</u>, 2019 WL

4805813, at *6 (S.D.N.Y. Sept. 30, 2019) (RA); <u>Campa v. Entergy Nuclear Operations, Inc.</u>,

2019 WL 4221560, at *9 (S.D.N.Y. Sept. 5, 2019) (NYSHRL).

If the plaintiff establishes a <u>prima</u> <u>facie</u> case of discrimination, a presumption of

discrimination is created and the burden shifts to the employer to articulate a "legitimate,

nondiscriminatory reason" for the adverse employment action.  <u>McDonnell Douglas</u>, 411 U.S. at

802; <u>St. Mary's</u>, 509 U.S. at 506-07; <u>Burdine</u>, 450 U.S. at 253-55; <u>Leavitt</u>, 465 F.3d at 90.  The

employer's reason need only be based on a reasonable belief to be legitimate and

nondiscriminatory.  <u>See</u>, <u>e.g.</u>, <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 44 (2d Cir. 2000) ("The

key question is whether it was reasonable for the employer to rely on the [information] in

making its employment decision."); <u>Ozemebhoya v. Edison Parking Corp.</u>, 2007 WL 2593008,

at *7 (S.D.N.Y. Sept. 7, 2007) ("An employer may sustain its employment decision without showing that the information on which it relied in its investigation was correct, but only that it reasonably relied on such information."). If the employer articulates such a reason for its action, the presumption of discrimination is eliminated, and "the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." James, 233 F.3d at 154 (citing cases). Such evidence may include, for example, a showing that "'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (quoting Burdine, 450 U.S. at 253). Importantly, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" St. Mary's, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253) (brackets in original); accord Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000). Thus, it is not sufficient for the fact-finder to disbelieve the employer's explanation; rather, "'the fact-finder must believe the plaintiff's explanation of intentional discrimination.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (quoting St. Mary's, 509 U.S. at 519). In other words, the plaintiff "must always prove that the conduct at issue . . . actually constituted discrimination." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (internal quotation marks, emphasis, and brackets omitted).

Nevertheless, while the plaintiff must prove that the defendant's proffered reasons for termination were pretextual, the plaintiff is not always required to "introduce additional, independent evidence of discrimination." Reeves, 530 U.S. at 149. "In appropriate circumstances," the evidence of pretext alone will be sufficient to "infer . . . that the employer is

dissembling to cover up a discriminatory purpose." Id. at 147; see also Schnabel, 232 F.3d at 90

("Reeves clearly mandates a case-by-case approach, with a court examining the entire record to

determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact

that the defendant intentionally discriminated against the plaintiff.'") (quoting Reeves, 530 U. S.

at 143).

We first address whether Sivio has stated a prima facie case under the relevant statutes

before next moving to pretext analysis. The parties do not dispute the first and second elements

of a prima facie discrimination claim are met here — namely that Sivio was disabled and that

VCM was subject to the ADA. See Def. Mem. at 17. Thus, we must determine whether a

reasonable jury could conclude that: 1) Sivio was otherwise qualified to perform the essential

functions of a care manager and, 2) that Sivio was terminated because of her disability. In

arguing that Sivio was not qualified to perform the essential functions of a care manager, VCM

relies on the same arguments made in support of its request for summary judgment on the failure

to accommodate claim. Specifically, VCM again argues that Sivio was properly terminated

because she could no longer perform an essential function of her job. See Def. Mem. at 29

("Plaintiff cannot establish the third element of a prima facie case of disability discrimination for

the reasons stated in Point I. We do not restate those reasons here."). We reject those arguments

here for the same reasons we rejected them with respect to the failure to accommodate claim.

The analysis of the final discrimination claim element — whether Sivio was terminated

because of her disability — is similarly straightforward. VCM explicitly stated in its email

terminating Sivio that she was being fired "because she could no longer perform the essential

functions of her job." Def. Reply to Pl. 56.1 Statement ¶ 83. Thus, because Sivio's disability

was the reason VCM thought Sivio could no longer perform the essential functions of her job, a reasonable jury could conclude Sivio was terminated because of her disability.  See Parker v. Columbia Pictures Indus., 204 F.3d 326, 338 (2d Cir. 2000) ("Terminating a disabled employee . . . who can perform the essential functions of the job but cannot return to work because the employer has denied his request for reasonable accommodation, is disability discrimination under the ADA."); Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 143 (2d Cir. 1995) ("Failure to consider the possibility of reasonable accommodation for . . . disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities."); accord Grizzell v. Cyber City Teleservices Mktg., Inc., 2010 WL 2622933, at *7 (M.D. Tenn. June 25, 2010) (internal quotation marks omitted) (plaintiff "suffered discrimination" where defendant "refused to make a reasonable accommodation to enable Plaintiff to receive treatment for post traumatic stress disorder, and instead terminated [him].").

Once the plaintiff has established a prima facie case of discrimination, as Sivio has here, the burden shifts to the defendant to establish a legitimate, non-discriminatory reason for the termination.  McDonnell Douglas, 411 U.S. at 802.  VCM fails to meet thus burden because, as discussed above, VCM explicitly stated in their correspondence terminating Sivio that she was being terminated because her disability prevented her from performing the essential functions of her job.  Def. Reply to Pl. 56.1 Statement ¶ 83.  Once again, VCM relies on their previously-made arguments that the termination of Sivio based on her alleged inability to perform an essential function of her role cannot be considered a discriminatory reason for her termination.  See Def. Mem. at 29-30.  Thus, we conclude a reasonable jury could reject that argument for the

reasons previously stated.

C. Retaliation Claims (ADA, RA, NYSHRL, and NYCHRL)

Sivio's claims of "retaliation are analyzed under the same burden-shifting framework established for Title VII cases." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002); see Collins v. Indart-Etienne, 59 Misc. 3d 1026, 1041 (Sup. Ct. 2018) ("The elements of a retaliation case are the same under Section 504 of the [RA] and the American with Disabilities Act ('ADA') and the State and City HRLs.").  Thus, to make out a prima facie case of retaliation under these statutes, "a plaintiff must present evidence that shows (1) participation in a protected activity; (2) that [her employer] knew of the protected activity; (3) an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action."  Littlejohn v. City of N. Y., 795 F.3d 297, 315-16 (2d Cir. 2015) (internal quotation marks omitted) (quoting Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010)). Generally, this last element may be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000); accord Littlejohn, 795 F.3d at 319.

If the plaintiff establishes a prima facie case, a presumption of discrimination or retaliation is created and the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action.  McDonnell Douglas, 411 U.S. at 802; accord St. Mary's, 509 U.S. 502, 506-07 (1993); Ya-Chen Chen v. City Univ. of N. Y., 805

F.3d 59, 70 (2d Cir. 2015). If the employer articulates a non-retaliatory explanation for its conduct, the presumption of retaliation is eliminated, and the plaintiff must meet her ultimate burden of proving "that the desire to retaliate was the but-for cause of the challenged employment action." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013); accord Vasquez v. Empress Ambulance Serv., 835 F.3d 267, 272 n.4 (2d Cir. 2016); Ya-Chen Chen, 805 F.3d at 70. "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Nassar, 133 S. Ct. at 2533; accord Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90-91 (2d Cir. 2015); Bowen-Hooks v. City of N. Y., 13 F. Supp. 3d 179, 231 (E.D.N.Y. 2014). This proof can include "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its actions," such that "a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013).

"The plaintiff 'has the ultimate burden of'" persuading a jury that defendants engaged in retaliation under the ADA. Williams v. N.Y.C. Dep't of Health & Mental Hygiene, 299 F. Supp. 3d 418, 427 (S.D.N.Y. 2018) (quoting McDonald v. City of N. Y., 786 F. Supp. 2d 588, 613 (E.D.N.Y. 2011)). Thus, if the first two steps of the burden-shifting test have been satisfied, "the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason for the allegedly retaliatory conduct is a pretext." Villanti v. Cold Spring Harbor Cent. Sch. Dist., 733 F. Supp. 2d 371, 384 (E.D.N.Y. 2010) (internal citations, quotation marks, and alterations omitted). Nonetheless, "[i]n appropriate circumstances," the evidence of pretext alone will be sufficient to "infer . . . that the employer is dissembling to cover up a [retaliatory]

purpose."  Reeves, 530 U.S. at 147; see also Schnabel, 232 F.3d at 90 (citation omitted) (quoting Reeves, 530 U.S. at 143) ("Reeves clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally [retaliated] against the plaintiff.'").

Despite the framework set up in McDonnell Douglas, Second Circuit case law makes clear that the Court may simply assume that the plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate — and in this case non-retaliatory — reason for the adverse employment action. See, e.g., Graves v. Finch Pruyn & Co., 457 F.3d 181, 187-88 (2d Cir. 2006) (declining to resolve a dispute regarding the establishment of a prima facie case of age discrimination on the ground that plaintiff had "not pointed to any record evidence to dispute [defendant's] legitimate reason . . . for the alleged adverse employment action"); Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001) (declining to decide whether a prima facie case was made out because defendant "met its burden to put forth legitimate, nondiscriminatory reasons for [plaintiff's] termination, and [plaintiff] has failed as a matter of law to proffer evidence of pretext sufficient to go to a trier of fact"); Sattar v. Johnson, 129 F. Supp. 3d 123, 138 (S.D.N.Y. 2015) (citing cases), aff'd, 669 F. App'x 1 (2d Cir. 2016).

Because "[t]he standards for evaluating . . . retaliation claims are identical" under the NYSHRL, ADA, and RA," we apply the same analysis to Sivio's retaliation claims under these statutes.  See Vasquez, 835 F.3d at 271 n.3 (alteration and omission in original) (internal quotation marks omitted) (quoting Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, 716 F.3d 10, 14 (2d Cir. 2013)); see also Margerum v. City of Buffalo, 24 N.Y.3d 721, 731 (2015)

(citations omitted) ("[T]he standards for recovery under the New York Human Rights Law are in nearly all instances identical to Title VII and other federal law.").

Claims under the NYCHRL, however, are governed by a standard more favorable to the plaintiff. First, rather than just protecting plaintiffs who engage in protected activities from adverse employment actions, the NYCHRL more broadly protects plaintiffs who "oppos[e] any practice forbidden under" the law from employer conduct that is "reasonably likely to deter a person engaging in such action." Mihalik, 715 F.3d at 112; see also N.Y.C. Admin. Code § 8-107(7) ("It shall be an unlawful discriminatory practice" for an employer to engage in acts "reasonably likely to deter a person from" opposing "any practice forbidden" under the law). Additionally, while a NYCHRL plaintiff must establish a prima facie case, and a defendant will then have an opportunity to offer legitimate reasons for its actions, the analysis that follows varies. If the defendant meets its burden,

> summary judgment is appropriate if no reasonable jury could conclude either that the defendant's "reasons were pretextual," Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 946 N.Y.S.2d 27, 35 (1st Dep't 2012), or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least "in part on discrimination," id. at 41 (quoting Aulicino v. New York City Dep't of Homeless Servs., 580 F.3d 73, 80 (2d Cir. 2009)). In other words, summary judgment is appropriate if "the record establishes as a matter of law" that discrimination or retaliation "play[ed] no role" in the defendant's actions. Mihalik, 715 F.3d at 110 n.8 (quoting Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir. 2013)); see also Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 872 N.Y.S.2d 27, 38, 40 n.27 (1st Dep't 2009).

Ya-Chen Chen, 805 F.3d at 76 (alteration and emphasis in original).

Turning first to the non-NYCHRL claims, Sivio's requests for accommodation and the filing of her EEOC complaint are both protected activities. Pacheco v. Park S. Hotel, LLC, 2014 WL 292348, at *4 (S.D.N.Y. Jan. 27, 2014) ("[R]equests for accommodation constitute

protected activity under the ADA . . . ."); <u>Blanco v. Brogan</u>, 620 F. Supp. 2d 546, 554 (S.D.N.Y. 2009) (Under Title VII and the NYSHRL, "[p]laintiff engaged in protected activity by filing an EEOC Complaint . . . ."). Additionally, VCM obviously knew about Sivio's requests for accommodation and the record shows that Sivio's Notice of Charge of Discrimination was sent by the EEOC to VCM on October 18, 2017. <u>See</u> Notice of Charge of Discrimination, dated Oct. 18, 2017 (annexed as Ex. F to Witkin Decl.) (Docket # 52-6). Thus, our analysis is confined to the remaining two elements of a retaliation claim: whether Sivio suffered an adverse employment action and whether a causal connection exists between the protected activity and the adverse employment action.

With regard to a retaliation claim's requirement that an individual suffer an adverse employment action, Sivio argues she suffered an adverse employment action when VCM audited her cases, made her work from VCM's home office, scheduled meetings they knew she could not attend, and terminated her employment. FAC at 8-9. Case law is clear, however, that that case audits, being required to work from the office, and scheduling meetings are not by themselves adverse employment actions within the context of a retaliation claim. <u>See</u> <u>Leifer v. New York State Div. of Parole</u>, 391 F. App'x 32, 34 (2d Cir. 2010) (employee who could not attend meetings scheduled by employer did not suffer an adverse employment action where employee failed to show how the inability to attend the meetings "resulted in a materially adverse change in the terms and conditions of [his] employment") (internal quotation marks and citation omitted); <u>Dowrich v. Aramark Healthcare Support Servs., Inc.</u>, 2007 WL 2572122, at *11 (E.D.N.Y. Sept. 4, 2007) (transfers and audits are not adverse employment actions because "an adverse employment action must be something more than an every day work occurrence.");

Smith v. AVSC Int. Inc., 148 F. Supp. 2d 302, 313 (S.D.N.Y. 2001) ("[N]ot allowing [plaintiff] to work from home . . . [does] not constitute adverse employment action[ ] as a matter of law.").

Termination, however, is obviously an adverse employment action. VCM has articulated a non-retaliatory reason (even if it was discriminatory for the reasons already discussed) for Sivio's termination: that is, VCM's belief that her disability could not be accommodated. We concluded above that a reasonable jury could find VCM's articulated reason for termination was itself discriminatory as well as a failure to accommodate Sivio's disability. Nonetheless, VCM's articulated reason is still non-retaliatory and thus the burden shifts back to Sivio to present evidence that carries "the burden of persuasion that the proffered reason for the allegedly retaliatory conduct is a pretext." Villanti, 733 F. Supp. 2d at 384.

Here, Sivio points to no evidence in the record — other than the fact that there was a brief period between her EEOC complaint and her termination — that suggests a retaliatory relationship between her protected activity and her termination. See Pl. Mem. at 1; Pl. 56.1 ¶ 83. While "temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation," "without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext . . . . Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact." El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010). Thus, no reasonable jury could conclude she was terminated purely out of retaliation — as opposed to discrimination — based on this record, and the retaliation claim must fail.

As previously noted, Sivio's NYCHRL claim is analyzed under the broader provisions of that statute, which protect plaintiffs who "oppos[e] any practice forbidden under" the law from

employer conduct that is "reasonably likely to deter a person engaging in such action." Mihalik, 715 F.3d at 112. Additionally, under the NYCHRL, summary judgment is inappropriate where a reasonable jury could conclude "defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least 'in part on discrimination.'" Ya-Chen Chen, 805 F.3d at 76 (quoting Melman, 98 A.D.3d 107) — or, in this case, retaliation. However, even under the more relaxed NYCHRL standard, when "Plaintiff's sole evidence of pretext" is "the temporal proximity between Plaintiff's complaints and Defendants' discipline," a NYCHRL retaliation claim cannot survive summary judgment if the employer has shown a non-retaliatory reason for the plaintiff's mistreatment. Tomizawa v. ADT LLC, 2015 WL 5772106, at *32 (E.D.N.Y. Sept. 29, 2015).

Here, even assuming VCM auditing Sivio's cases, making Sivio work from VCM's home office, scheduling meetings they knew she could not attend, and terminating Sivio's employment constituted conduct that was reasonably likely to deter Sivio from opposing a practice forbidden under the law, Sivio's NYCHRL claim still fails because Sivio cannot establish that her opposition to a practice forbidden under the law played any role whatsoever in prompting VCM's alleged retaliatory behavior. To the contrary, construing the evidence in the light most favorable to Sivio, it could lead only to a finding that VCM's unfavorable treatment of Sivio arose from VCM's perception that she could not perform the essential functions of her job. See generally Gioia v. Forbes Media LLC, 501 F. App'x 52, 56 (2d Cir. 2012) (granting summary judgment on NYCHRL retaliation claim where "[s]hort of speculation, there is no evidence that" retaliation "played even a partial motivating role in the decision to terminate" plaintiff); Rogers v. Bank of N. Y. Mellon, 2016 WL 4362204, at *22 (S.D.N.Y. Aug. 15, 2016) ("Plaintiff's

allegations of temporal proximity alone are also insufficient to demonstrate pretext even under the NYCHRL."). Thus, Sivio's retaliation claim fails even after conducting a "independent liberal construction analysis" under the NYCHRL that is "targeted to understanding and fulfilling what the statute characterizes as [its] 'uniquely broad and remedial purposes,' which go beyond those of counterpart State or federal civil rights laws." Bennett v. Health Mgmt. Sys., Inc., 92 A.D.3d 29, 34 (2011).

## IV. CONCLUSION

For the reasons discussed above, VCM's motion for summary judgment (Docket # 49) is granted as to Sivio's retaliation claims, but denied in all other respects.

SO ORDERED

Dated: January 31, 2020
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge